**UNITED STATES of America, Appellee,**

v.

**Roger MORIN, a/k/a Paris Video, Defendant, Appellant.**

Nos. 88–2181, 88–2228.

United States Court of Appeals, First Circuit.

Heard June 6, 1989.

Decided Nov. 15, 1989.

---

June Zellers Schau with whom Stephen B. Wade and Skelton, Taintor & Abbott, Auburn, Me., were on brief, for defendant, appellant.

Margaret D. McGaughey, Asst. U.S. Atty., Portland, Me., with whom Richard S. Cohen, U.S. Atty., and Joseph H. Groff III, Asst. U.S. Atty., Portland, Me., were on brief, for U.S.

Before BREYER, REINHARDT,* and TORRUELLA, Circuit Judges.

* Of the Ninth Circuit, sitting by designation.

TORRUELLA, Circuit Judge.

Roger Morin appeals from two district court orders. The first revoked his probation and reinstated his original sentence of two years in prison. The second order denied, for lack of jurisdiction, his motion for reconsideration of the first order.

On April 30, 1985, an indictment was filed charging Morin with two counts of criminal conduct: unauthorized distribution of eight films and copyright violations with respect to 222 films. Morin entered into a plea agreement with the government on July 31, 1986. In exchange for dismissal of count one, Morin entered a plea of guilty to the second count. The plea was accepted, and the district court sentenced Morin to two years of imprisonment. In consideration of Morin's health—among other things, he has severe kidney problems which require him to be on dialysis three times a week and has had two heart attacks—the district court suspended execution of his sentence and placed Morin on probation for two years.

Morin has an extensive record of criminal activity. Since 1955, when Morin was 21, twenty one different charges have been brought against him. 1987 Presentence Investigation Report at 3–4. One of his prior convictions, for illegally buying food stamps in 1984, was entered by the same district judge that presided over this case. In that case, Morin had also pled guilty, and been placed on probation. During the sentencing procedures, the district court found that Morin had deliberately lied to it regarding his prior convictions. Despite the fact that the court found that Morin was an "unremorseful, unrepentant and unreconstructed violator," Appendix at 260 (hereinafter "App."), and had shown a "consistent disregard and disrespect for the orderly processes of the law," App. at 266, the district court suspended the execution of a one year prison term and placed Morin on probation for two years because of his poor medical condition.

The copyright offenses that are the subject of this case were committed while Mo-

rin was still on probation for the earlier food stamps conviction.[1] While sentencing Morin on the copyright offenses, the district court warned him that "this is the last time that your conditions of health are going to keep you out of federal prisons so far as this court is concerned. If you come back in here and are found in violation of this probation I will put you in jail." App. at 93.

One of the conditions of probation was that Morin not leave the judicial district of Maine without the permission of the probation officer. Although Morin's original probation officer was content if Morin obtained oral permission for this purpose, Morin's new probation officer, Vincent Frost, had orally informed Morin that he had to obtain written permission before leaving the district. On March 9, 1988, Morin orally requested permission from Frost to visit his sister in Connecticut. Frost said he would approve the trip, but instructed Morin to submit a written request listing his travelling schedule and indicating where he would be staying. Morin does not deny that Frost said as much, but claims that he does not remember hearing it. Morin called the probation office before he left. He spoke to a secretary and told her that he was leaving for Connecticut and that he had discussed the trip with Frost. The secretary did not give him permission to take the trip, but promised to relay the message to Frost. Morin does not remember whether he mentioned to the secretary that he would also be going to New York during this trip. Morin left for Connecticut and New York on Saturday, March 19, and returned to Maine on the following Friday. He called Frost on Monday for some other purpose. During that conversation, Frost asked him where he had been. Morin explained that he had gone to Connecticut and New York. Frost told him that he should have obtained written permission before travelling, and that his failure to do so amounted to a violation of probation.

On April 13, 1988, Frost asked Morin more questions about his March trip to New York. Morin stated that he had stayed in New York City on Tuesday night and Thursday night, because he had been too tired to drive back to Connecticut after dialysis. On May 27, Frost asked Morin if he had only spent two nights in New York City. After much thought, Morin confessed that he had been in New York for four nights. Frost asked him if he was lying. Morin replied that he was not. When Frost confronted him with hotel records indicating that Morin had been in New York City for five nights, Morin conceded that it might have been five nights.

On June 15, 1988, Frost filed a petition for probation action, alleging that Morin had violated one of his probation conditions by travelling outside Maine from March 19–25 without advance written permission. A hearing on the probation petition was held before the district court on November 7, 1988. Morin pled guilty to having violated probation by travelling without permission. The court held that Morin knew that he had to obtain written permission before travelling outside Maine. Not only did he fail to do so, but he tried to prevent Frost, his probation officer, from discovering that the trip had included a stay in New York City. When confronted, Morin continued to lie about how long he had been in New York City. It was only when he was presented with evidence of the length of his stay that he admitted the truth. The court also questioned whether Morin's reasons for visiting New York were legitimate. Concluding that "[t]his is the kind of violation that strikes at the very heart of the probation system," App. at 153, the court revoked Morin's probation and reinstated the original two year sentence.

On November 11, 1988, Morin filed a motion to extend the time for filing a notice of appeal from the revocation order. He argued that he needed the extension to file a motion for reconsideration while preserving his right to appeal. The district court denied the motion. On November 16, 1988, Morin filed a motion for reconsideration of

---

1. As part of the plea agreement on the copyright conviction, the government agreed that it would not seek to have Morin's probation on the food stamps conviction revoked as a result of the new indictment.

the order revoking probation, a motion to reduce sentence, and a third motion not relevant here. On November 18, 1988, Morin filed a notice of appeal from the revocation order. The government claimed that the taking of an appeal divested the district court of jurisdiction to hear the motion for reconsideration, relying on *United States v. Distasio*, 820 F.2d 20, 23 (1st Cir.1987). The district court was persuaded by this argument, and on December 2, 1988, entered an order dismissing the three motions because it no longer had jurisdiction over the case. Morin appeals this order, arguing that the notice of appeal should not deprive the district court of jurisdiction. He says judicial efficiency would be promoted if the notice of appeal were treated as being nullified by the motion for reconsideration. Morin points out that this approach has been adopted by the Seventh Circuit in *United States v. Gargano*, 826 F.2d 610 (7th Cir.1987) (Posner, J.).

A subsequent development has reduced the importance of this issue. In a memorandum issued on December 15, the district court amplified its December 2 order. According to Morin, this memorandum indicates the district court's unwillingness to reconsider its decision. Consequently, he concedes that the relief he requests—a remand for reconsideration on the merits—is moot. The government agrees that remanding this case to the district court is more likely to waste rather than conserve judicial resources. Under these circumstances, we will treat the combination of the December 2 and 15 pronouncements as a denial on the merits of the motion for reconsideration. The jurisdictional issue is therefore moot, and the appeals from both the November 7 and December 2 orders present the same substantive issues— whether the district court was justified in revoking Morin's probation and in reinstating his sentence.

We begin our analysis of the substantive issues by describing Morin's three contentions on appeal. He concedes that he violated one of his probation conditions—that he not leave the judicial district without the written permission of his probation officer. Morin first argues that this was an under-

standable, excusable and relatively technical violation, and that it did not justify the revocation of probation. Second, he claims that the court revoked his probation not because of his failure to comply with the reporting requirement, but because (a) he committed the copyright violations while he was on probation for the food stamps convictions; (b) the district court incorrectly believed that Morin had lied to him during the sentencing hearing for the food stamps conviction; and (c) the district court incorrectly believed that he had lied to his probation officer in an effort to conceal the details of his trip to New York City. Morin argues that because he was not given formal notice that these were the actual grounds for revocation of probation, and not allowed to present evidence rebutting these charges, due process requires that he be granted a new revocation hearing. Third, even if revocation were justified, Morin claims that the court abused its discretion in reinstating his full sentence of two years imprisonment. We address each of these arguments in turn.

District courts enjoy broad discretion when deciding whether to revoke probation. *See In re Whitney*, 421 F.2d 337, 338 n. 2 (1st Cir.1970). Their decisions will not be reversed absent a clear showing of an abuse of discretion. *See United States v. Babich*, 785 F.2d 415, 418 (3d Cir.), *cert. denied*, 479 U.S. 833, 107 S.Ct. 123, 93 L.Ed.2d 69 (1986); *United States v. Hamilton*, 708 F.2d 1412, 1414 (9th Cir.1983) (Kennedy, J.); *United States v. Rice*, 671 F.2d 455, 458–59 (11th Cir.1982); *United States v. McLeod*, 608 F.2d 1076, 1078 (5th Cir.1979) (*per curiam*); *United States v. Rodgers*, 588 F.2d 651, 653–54 (8th Cir. 1978) (*per curiam*). In this case, the district court observed that Morin's violation "strikes at the very heart of the probationary system." App. at 153. Furthermore, instead of honestly cooperating with his probation officer, Morin did not admit the extent of his stay in New York until confronted with uncontrovertible evidence. The court noted that Morin behaved in a similar manner during the sentencing hearing for his food stamps conviction. The

court also pointed out that this was the second time that Morin had disregarded probation instructions (the first time being when he was convicted of copyright violations while on probation for the food stamps conviction). To vindicate its own authority and to maintain the credibility of the probationary system, *see* App. at 145, 153, the district court concluded that it had to revoke Morin's probation.

█ The district court did not abuse its discretion. Despite Morin's claim that his violation was merely technical, there is no question that failure to comply with reporting requirements is a serious violation of probationary conditions, and that such failure alone can justify the revocation of probation. *See Babich*, 785 F.2d at 418; *Higdon v. United States*, 627 F.2d 893, 900 (9th Cir.1980); *United States v. Rodgers*, 588 F.2d 651, 654 (8th Cir.1978) (*per curiam*); *United States v. Lara*, 472 F.2d 128, 129 (9th Cir.1972). Of course, the fact that a serious violation has occurred does not imply that probation should automatically be revoked. *See United States v. Diaz–Burgos*, 601 F.2d 983, 985 (9th Cir. 1979) (*per curiam*); *United States v. Reed*, 573 F.2d 1020, 1024 (8th Cir.1978). Deciding what to do with a probationer who has violated the conditions of his probation necessarily involves a prediction about the probationer's future acts. *See Reed*, 573 F.2d at 1024. Based on Morin's previous violation of probation and his demonstrated evasiveness, the district court was fully justified in concluding that probation was not a suitable remedy for Morin. We hold that the district court did not abuse its discretion in revoking Morin's probation.

█ Our analysis of Morin's first claim foreshadows our disposition of his second claim. Revocation hearings involve two analytically distinct stages. *See Black v. Romano*, 471 U.S. 606, 611, 105 S.Ct. 2254, 2257, 85 L.Ed.2d 636 (1985); *Gagnon v. Scarpelli*, 411 U.S. 778, 784, 93 S.Ct. 1756, 1760, 36 L.Ed.2d 656 (1973). The first stage is wholly retrospective, and focuses on the factual question of whether the probationer has violated one of the conditions of his probation. *See Romano*, 471 U.S. at 611, 105 S.Ct. at 2257. If there has been a violation, the inquiry proceeds to the second stage, which is predictive and discretionary. *See id.* It determines whether the violation warrants revocation, considering the nature of the violation and the history of the probationer. The probationer is entitled to notice, an opportunity to present favorable witnesses, and an opportunity to confront and cross-examine adverse witnesses with respect to the condition that he allegedly violated for purposes of the first stage of the hearing. *See id.; United States v. Reed*, 573 F.2d 1020, 1023 (8th Cir.1978). But he is not entitled to the same protections with respect to every factor that the court will take into consideration during the second stage of the hearing. A contrary rule would "endlessly delay criminal administration in retrial of collateral issues." *Williams v. New York*, 337 U.S. 241, 250, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (1949) (holding that trial court could consider extra-record material when sentencing defendant). Although the probationer may not call witnesses with respect to the second stage of the hearing, he has the right to address the court and present it with mitigating circumstances. *See Romano*, 471 U.S. at 614, 105 S.Ct. at 2259; *Morrissey v. Brewer*, 408 U.S. 471, 488, 92 S.Ct. 2593, 2603, 33 L.Ed.2d 484 (1972); *United States v. Turner*, 741 F.2d 696, 698–99 (5th Cir.1984).

█ In this case, the record is clear that the first stage of the revocation hearing dealt solely with Morin's violation of the reporting requirement. He was given adequate pre-hearing notice that the government would seek to prove that he had violated this condition, and was allowed to testify and also to cross-examine the government's witness. Once it was determined that the reporting condition had been violated, the district court took other incidents into consideration while deciding whether the violation warranted revocation. Both Morin and his attorney had a more than adequate opportunity to address the court in an effort to put these prior incidents in the best possible light. *See*

App. at 140–48. The fact that they failed to convince the district court does not implicate due process.

■ Morin's third argument has two components. The first component questions the appropriateness of imprisonment as a punishment following revocation of probation. Morin relies on the American Bar Association Standards for Criminal Justice [2] and the Model Penal Code.[3] Both compilations essentially recommend that even if revocation is proper, the probationer should not be sentenced to imprisonment unless (a) he has been convicted of another crime, (b) his continued liberty creates undue risk that he will commit another crime, or (c) if such disposition is essential to vindicate the authority of the court. Conditions (a) and (b) are clearly not relevant here, Morin argues, and imprisonment is not essential to vindicate the authority of the court. We disagree. The district court had warned Morin in no uncertain terms that this was the last time that his medical condition would keep him out of jail. If he violated the terms of his probation, he would be imprisoned. We are not generally in favor of inflexible warnings of this type. The special circumstances of this case, however, required the court to notify Morin of the narrow leeway that he had. Despite this stern warning, Morin played fast and loose with his reporting requirements, an especially important probationary condition. Under these circumstances, we think imprisonment is necessary to vindicate the authority of the court and the credibility of its orders.

The second component of this argument questions the appropriateness of reinstating the full sentence of two years. The district court has broad latitude in deciding whether to reinstate the original sentence in whole or in part. *See United States v. Colvin*, 644 F.2d 703, 706 (8th Cir.1981);

*Higdon*, 627 F.2d at 900. Morin's argument essentially boils down to a plea for leniency; the district court abused its discretion by not giving sufficient weight to Morin's deteriorating medical condition.[4] Over the past five years, the district court has been more than sympathetic to Morin's physical problems. Morin, however, has responded by treating the court's conditions with disdain. He will not now be heard to complain that the cupboard is bare.

The district court's orders are *affirmed*.

BREYER, Circuit Judge (concurring).

I do not agree with the dissent for two reasons. First, in my view, the law is clear. Morin signed a document called "Conditions of Probation." Condition 4 said "You shall not leave the Judicial district [*i.e.*, Maine] without the permission of the probation officer." After an evidentiary hearing, the district court found that Morin had left "without the proper authorization" and thus had violated Probation Condition 4. The district court had the legal power to revoke probation for such a violation. *See* Majority Opinion at 331–332 (citing cases).

The cases chiefly relied upon by the dissent involve different circumstances. In *United States v. Reed*, 573 F.2d 1020 (8th Cir.1978), *United States v. Hamilton*, 708 F.2d 1412 (9th Cir.1983), and *United States v. Simmons*, 812 F.2d 561 (9th Cir.1987), the court of appeals remanded a case in which the district court revoked probation. In *Reed*, however, the court found that the revocation was based partly on a probation violation that had *not been charged* and had *not occurred*. *See Reed*, 573 F.2d at 1023. Here, in contrast, Morin *admitted* having violated his probation. Similarly, in both *Hamilton* and *Simmons*, the Ninth Circuit found, among other things, that the

**2.** American Bar Association, III *Standards for Criminal Justice*, Standard 18–7.3(c), at 18–508 (2d ed. 1980).

**3.** American Law Institute, *Model Penal Code* § 301.3(2).

**4.** Morin also claims that the district court should have ordered the preparation of a new

presentence investigation report prior to sentencing to obtain updated information regarding his deteriorating health. The problem with this argument is that Morin never requested a new report until after the district court issued its revocation and reinstatement order.

probationer did not receive adequate notice of the true nature of his conditions of parole. *See Hamilton,* 708 F.2d at 1415; *Simmons,* 812 F.2d 561. Here, the district court found that Morin had received an "elaborate explanation of what was expected of him ... in respect to travel." Morin received this explanation on the day he was sentenced and again shortly before his trip. Thus, the legal precedents seem to me to support the district court's decision. *See, e.g., United States v. Romero,* 676 F.2d 406, 407 (9th Cir.1982) ("In addition to the bare words of the probation condition, the probationer may be guided by the further definition, explanations, or instructions of the ... probation officer.")

Second, this is not a case that warrants the creation of some new legal principle. The record, as I read it, does not show the imposition of a severe punishment on a sick man for a technical violation so much as it shows a district court eventually concluding that sickness is not a license to violate the law with impunity. It suggests that Morin has made very clear to the court system several times that he is ill; and the system has responded with probation. Morin's violation is not "technical." It amounts to a violation of probation's rather slight restriction on his freedom of action, namely that he cannot leave the state without the requisite permission; and its circumstances suggest both that he does not take the restriction very seriously and that he cannot be trusted to report accurately on his movements. The district court found that Morin "attempt[ed] to withhold ... information" about his trip to New York City, revealing it "only on very specific and detailed inquiry from the probation officer" and only "after he underst[ood that] the probation officer [had] been investigating him." The district court could conclude that probationer is a person who will violate restrictions on movement when he thinks he can get away with it, and who,

when caught, will cite his own bad health as an excuse. The record supports such a characterization. The court's incarceration order amounts to a determination that Morin should not be trusted to make his own arrangements for treatment; instead, prison officials will make and supervise such arrangements. Given these facts, the court's decision to revoke probation was within its legal powers.

REINHARDT, Circuit Judge, sitting by designation, dissenting:

Roger Morin is in disastrous physical condition. He is a recovering alcoholic who suffers from diabetes, high blood pressure, obesity, psoriasis, neurofibromatosis (a painful condition, mandating surgery several times a year to remove tumors growing on his nerve endings), and total kidney failure requiring him to undergo dialysis several times each week. The majority has concluded that Morin may be imprisoned for two years for a single violation of an unwritten probation condition that reflects only the personal policy of his newly assigned probation officer.

Morin orally advised his new probation officer that he planned to travel to Connecticut to see his sister.[1] That was the procedure he had followed for approximately three years with his former probation officer. Because under the new probation officer's unwritten policy travel requests were required to be in writing, Morin received only preliminary approval for the trip. Subsequently, he failed to submit a written request and thus did not obtain the new probation officer's final, formal consent.[2]

At the time Morin visited his sister, without receiving formal written approval, he was serving a two-year term of probation for willful copyright infringement based on his unauthorized distribution of video cassettes. My colleagues and I are in agreement on the essential facts that led to the

---

**1.** It is not clear whether when Morin obtained the preliminary approval for his trip he mentioned to the probation officer that, as had been his custom, he intended to go to New York for his regular dialysis treatments during his visit to his sister.

**2.** When Morin called the probation officer two days before his planned departure to tell him he was leaving, the probation officer was not in the office.

revocation of Morin's probation and his imprisonment for a two-year period. As the majority notes, in order to travel outside the judicial district of Maine, Morin was originally required to submit only an oral report to his probation officer, who would then grant oral approval. Subsequently, his new probation officer, Vincent Frost, "orally informed Morin that he had to obtain written permission before leaving the district." Maj. Op. at 330. As stated by Frost during the Hearing of Revocation of Probation, "I told Mr. Morin [on December 11, 1987] ... that *my policy* was that any permission to travel was given in written fashion ... after we received from him a written request." (emphasis added). However, the Conditions of Probation, issued by the Court and signed by Frost that very same day, merely state that Morin "shall not leave the judicial district without permission of the probation officer." Nowhere is Frost's personal policy requiring written permission set forth in writing or in any orders of the Court; nor was Morin ever told that a violation of Frost's personal policy would warrant the revocation of his probation and the imposition of a substantial term of imprisonment.

If the new probation condition imposed by Frost was sufficiently important that its violation could lead to the draconian consequences visited on Morin, then due process and notions of fundamental fairness dictate that Morin should have received written notice of the new policy or at a minimum, clear and unambiguous notice that the new policy constituted an official requirement and that its violation could lead to revocation. "[U]nless [the probationer] received prior fair warning that his acts could lead to revocation, the district court's revocation

violated due process and was an abuse of discretion." *United States v. Simmons*, 812 F.2d 561, 565 (9th Cir.1987). *See also United States v. Hamilton*, 708 F.2d 1412, 1415 (9th Cir.1983) (the probationer "did not receive adequate notice as to the true nature of his obligations.... The interests of fairness require some level of consistency in the supervision of a probationer.")

In my opinion, Frost's oral statement that it was his *personal* policy to require a written request was not sufficient to warn Morin that his probation could be revoked for a single failure to adhere to that personal preference. The record provides at least one example of an instance in which Morin was specifically put on notice that Frost considered certain actions to constitute a violation of probation. Frost told Morin in their first meeting on December 11, 1987, that if Morin was late in making payments on the fine, it would be a violation of the terms of probation. Moreover, the Order Amending Conditions of Probation provides an example of a specific written requirement that a particular type of notice be in writing.[3] The lack of written notice concerning the new probation term was particularly significant because of the memory problems Morin suffered as a result of his debilitated physical condition.[4]

The majority concludes that the district court did not abuse its discretion in revoking Morin's probation and imposing a prison term because "the failure to comply with reporting requirements is a serious violation of probationary conditions, and that such failure alone can justify the revocation of probation." Maj. Op. at 332. However, the cases cited to support this proposition are based on far more serious

---

**3.** The Order Amending Conditions of Probation specified that a written request was required for a change in Morin's working hours. The order limited the number of hours that Morin could spend each week at his video and book stores. The next condition states that "The above hours [of the book store] may not be expanded without prior written notice to Probation." If the condition mandating a written request to travel was so serious that one violation would be sufficient to revoke probation, then notice of this requirement should also have been set forth in writing and included in the modified order.

**4.** Dr. Walworth, Morin's physician, testified that "[o]ne of the long term effects of chronic alcoholism is a loss of memory," and Morin was diagnosed as a chronic alcoholic. In fact, Morin's mental deterioration was so severe that he had no memory of one of the two heart attacks that he had suffered. In light of his physical and mental condition, Morin's memory lapses, not a deliberate attempt to disobey the terms of the probation, may have accounted for his failure to submit a written request.

violations than that committed by the unfortunate Mr. Morin. *See United States v. Lara*, 472 F.2d 128, 129 (9th Cir.1972) (the probationer moved to another city and disappeared for seven months); *United States v. Babich*, 785 F.2d 415, 416 (3d Cir.), *cert. denied*, 479 U.S. 833, 107 S.Ct. 123, 93 L.Ed.2d 69 (1986) (the probationer failed to report a subsequent arrest); *Higdon v. United States*, 627 F.2d 893, 900 (9th Cir. 1980) (the probationer falsified probation records); *United States v. Rodgers*, 588 F.2d 651, 653 (8th Cir.1978) (the probationer failed to report a new address and submit monthly reports for 11 months). Morin's failure to request permission in writing, when he had already received preliminary oral approval, is clearly of a far lesser order than the violations relied on by my colleagues.

All parties agree that Morin orally asked his probation officer for permission to travel and that Frost responded that he "had no problem with him making that trip," but requested Morin to submit a written letter. All parties also agree that two days before Morin departed for the six-day trip, he called the probation office and when, he learned that Frost was out of the office, left a message with the secretary as to his travel plans and his need to make arrangements for dialysis. Nor is there any dispute that upon returning from his trip, Morin called Frost and, when asked where he had been, answered truthfully. Under these circumstances, Morin's actions can best be characterized as a minor, technical violation. In actuality, he committed no greater offense than failing to conform fully to a personal, unwritten, unofficial requirement of his probation officer.[5] I am aware of no case in which so drastic a punishment has been imposed for so innocuous an act.

In considering probation offenses, appellate courts have specifically admonished judges to look to the nature of the violation before imposing serious consequences that restrict personal liberties. "The decision to revoke probation should not merely be a reflexive reaction to an accumulation of technical violations of the conditions imposed upon the offender. That approach would be inconsistent with and detrimental to the goals of the probation program." *United States v. Reed*, 573 F.2d 1020, 1024 (8th Cir.1978). *See also United States v. Hamilton*, 708 F.2d at 1415 ("We also do not suggest that revocation proceedings should be an automatic reaction to technical or minor violations simply to preserve the government's position."); *United States v. Tyler*, 605 F.2d 851, 853 (5th Cir.1979) (same). *Reed* was remanded to determine, among other things, whether the probationer "had attempted in good faith to comply with the reporting requirements of his probation."[6] 573 F.2d at 1023–24. Clearly, Morin did not simply ignore the terms of his probation. He discussed his travel plans with his probation officer and received oral preliminary approval; he also called his probation officer before he departed on the trip to advise him that he would be leaving, and called him again upon his return. Morin's failure to fulfill the additional personal requirement of the newly assigned probation officer, that he submit a formal written request, is not in and of itself the type of violation that warrants the revocation of probation and the imposition of the maximum possible prison term.

The majority's conclusion that the district court's decision was "fully justified" is "based on" ancillary considerations, namely Morin's general record of criminal activity, his alleged deceitfulness, and his previ-

---

**5.** Frost acknowledged at the Revocation Hearing that other probation officers, including Morin's former probation officer for the preceding three years, gave their probationers oral permission to travel.

**6.** In *Reed,* the Court noted that the "decision to revoke his probation was based not on commission of a new crime or other egregiously antisocial behavior, but merely on Reed's failure to

report, to give notice of an address change, to find employment, and to make restitution." 573 F.2d at 1025. Although Reed's violations were more serious than Morin's, the Court remanded the revocation decision to allow the district court to consider alternatives to incarceration for the full length of the probationer's unexecuted prison term.

ous violation of probation.[7] Maj. Op. at 332. Although I do not believe that ancillary reasons could under any circumstances justify the revocation of probation and the imposition of a substantial term of imprisonment where the triggering offense is so minor a technical violation of an unwritten personal rule of a probation officer, Morin's prior criminal record and alleged deceitfulness require further comment.

Preliminarily, I might note once again that Morin is indeed an unfortunate individual in every respect. In addition to suffering from almost every physical ailment short of the plague, he appears to be quite an unattractive human being in general. Nevertheless Morin, like the rest of us, is entitled to fair and reasonable treatment by his government, including the judiciary.

The majority emphasizes Morin's "extensive record of criminal activity," referring to the fact that 21 different "charges" have been brought against him. Maj. Op. at 329. However, this list of "charges" includes such activities as passing stop signs and red lights (4 counts), driving without a muffler, driving without a license (2 counts), parking illegally, driving under the influence (2 counts), permitting minors to play pinball, and speeding. With the exception of the unauthorized copying and purchase of food stamps convictions, the last non-traffic offense of which Morin was convicted—contributing to juvenile delinquency—occurred over 25 years earlier.[8] While Morin does not have a flawless

record, he is, at the same time, not a hardened criminal who "cannot be counted on to avoid antisocial activity." *Reed,* 573 F.2d at 1024 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 479, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972)). Permitting him to remain on probation would hardly jeopardize the safety of society. "[T]he whole thrust of the probation-parole movement is to keep men in the community, working with adjustment problems there, and using revocation *only as a last resort* when treatment has failed or is about to fail." *Reed,* 573 F.2d at 1024 (emphasis added). In Morin's case, revocation seems clearly contrary to the purposes and goals of probation.

Second, the district court and the majority justify their decisions on the ground that Morin was deceitful and misled his probation officer. The district court placed great emphasis on the uncharged accusation that Morin withheld information, misrepresented his conduct, and was dishonest. My review of the record persuades me that this accusation, like the violation itself, has been blown out of all proportion. In the revocation hearing, Frost testified at length on the subject of Morin's visit to New York and how many nights he actually spent in the City, in an effort to show that Morin was devious or deliberately deceptive. However, the record shows indisputably that Morin's conduct in this respect was far from egregious and certainly did not warrant imprisonment.[9]

---

**7.** The previous violation relates to an earlier probation order. As my colleagues note, "the copyright offenses ... were committed while Morin was still on probation for the earlier food stamps conviction." Maj. Op. at 330. Aside from this violation of an earlier order, Morin has not been found to have violated any conditions of probation other than the technical violation at issue here.

**8.** The Presentence Report lists an entry for assault in 1978, but provides no additional details. The charge was dismissed with a payment of $25 for costs and $122 for restitution. Furthermore, this charge does not appear on Morin's FBI Investigation Report.

**9.** The majority discusses in great detail the issue of whether Morin failed to disclose to his probation officer his intention to visit New York City

during his trip and how many nights he actually stayed in New York. Maj.Op. at 330. It is undisputed that Morin discussed his trip with Frost and received preliminary approval, and that he called Frost's office on March 17, 1988, two days before his planned departure and left a message with the secretary as to his travel plans and his need to make arrangements for dialysis. Frost did not respond to the message or return Morin's phone call. On March 19th, Morin left on his trip to visit his sister in Connecticut, and on this occasion, as he had on all such previous trips, he received dialysis treatments in New York. Morin had established an arrangement with a particular hospital in New York that was familiar with his records, and was willing to treat him on a semi-regular basis. Thus, it was customary for him to receive dialysis treatments in New York City while visiting his sister. Nothing in the record suggests that

I also have some reservations about the fairness of punishing Morin on the basis of his purported deceitfulness since the Petition for Probation Action failed to allege (with one exception) that he was deceitful. At the revocation hearing, the parties stipulated that the defendant violated condition # 4. The charge relating to that condition describes in detail Morin's failure to obtain written approval and his discussion with Frost's secretary. However, the charge makes no mention of any effort by Morin to conceal the fact that he had visited New York.[10] Nor is there any mention of the question of how many nights Morin actually stayed in New York City, or of any other alleged misrepresentation (other than with respect to the claim that Morin said that the secretary had given him permission to travel.)[11] Where the Petition specifies all of the circumstances and details of an alleged violation, to premise the revocation in part on unwritten and unarticulated charges may be misleading and unfair to the probationer. Morin had no way of knowing that an alleged misrepresentation of his travel itinerary would be a basis for revoking probation. *See Gagnon v. Scarpelli*, 411 U.S. 778, 786, 93 S.Ct. 1756, 1761, 36 L.Ed.2d 656 (1973) (The " 'minimum requirements of due process' includes ... written notice of the claimed violations of probation or parole" prior to the final hearing.); *see also Morrissey*, 408 U.S. at 489, 92 S.Ct. at 2604. Finally, with respect to the so-called deceitfulness issue, I might note that relying on the facts that relate to that issue is far different from relying on a probationer's prior criminal record or previous probation violation. Here, the deceitful acts allegedly occurred as an integral part of the charged conduct; given the detailed nature of the charge, those acts should have been set forth in the Petition for Probation Action. In contrast, one's prior criminal record, including a prior pro-

---

Morin had ever concealed this practice from the probation office.

Upon his return from the trip, Morin promptly called the probation office in accordance with his routine practice. When Frost asked him where he had gone, Morin immediately replied New York and provided his probation officer with the name and address of the hotel where he stayed. He did not lie, or try to conceal this information.

The majority places far too much emphasis on the question of how many nights Morin stayed in New York City. It is uncontested that Morin booked a hotel room in New York because he was never certain whether he could travel after he received dialysis. Morin departed for the trip on Saturday and returned on Friday, a total of six nights. The government based its deceitfulness claim on the existence of hotel records for five nights. However, it did not attempt to prove that Morin actually stayed in the hotel all five nights rather than spending some of them at his sister's place in Connecticut. Since Morin went to New York for a legitimate reason, to undergo kidney dialysis, I fail to understand the overriding significance attached to the issue of precisely how many nights he spent there.

10. **"Violation of Condition # 4: You shall not leave the Judicial District without the permission of the probation officer.**

The probation department alleges that the probationer traveled to New York City, where he was registered at the Ramada Inn at 8th Avenue and 48th Street, from March 20, 1988 to March 25, 1988 (EXHIBIT A). The probation department states that on two separate occa-

sions, December 11, 1987 and March 9, 1988, the probationer was instructed that written travel permission was required for travel outside the District of Maine and that a travel permission slip would be issued upon receipt of a letter from the probationer outlining his complete itinerary (including full addresses). The probationer traveled on this occasion without obtaining the necessary travel permission.

Upon questioning after his return from New York City, the probationer admitted that he had gone to New York City and that he had received permission from the 'secretary in your office.' This officer knew this to be a falsehood because the probationer office secretaries are not authorized to grant travel permission. This was later confirmed by means of a conversation with Dorthy Thompson, who received the subject's phone call on 3/17/88 requesting permission to travel. She has indicated that she instructed the subject that he must talk to the probation officer. Subject never called back."

11. Frost testified that the secretary had given him a written message that Morin had called concerning his travel plans. Frost also testified that Morin called after he returned, and when asked where he had gone, volunteered the information that he had been in New York. The only disagreement is over the question of whether Morin claimed to have received permission from the secretary, or merely claimed to have left a message for Frost with her. This disagreement, whatever the truth or whatever the misunderstanding, seems not to be of such great significance as to warrant a term of imprisonment.

bation violation, constitutes part of the historical record which one might ordinarily expect to be considered at the hearing.

Moreover, in my opinion, the district court judge paid insufficient heed to "circumstances [which] ... call for some degree of leniency on the part of the judge," specifically Morin's physical condition. *Higdon,* 627 F.2d at 901 n. 17. Even with a limited knowledge of medicine, one would be forced to conclude that given the extensive medical treatment Morin needs, imprisonment will present a severe risk to his health. Prisons are not the best places for individuals to receive complex medical care. Even when prison officials and doctors recognize the full extent of the medical treatment required, they are severely handicapped by a shortage of funds, personnel, and equipment. Indeed, it is possible that Morin's health is such that he may fail to survive his two-year prison term. While the district judge properly considered Morin's disastrous physical condition in the preceding hearings,[12] he failed to give sufficient weight to these same considerations this time. By placing too little weight on Morin's debilitated condition and too much weight on his commission of a technical violation of an unwritten personal policy of an individual probation officer, the judge may have unnecessarily jeopardized Morin's chances of survival.

The Supreme Court has suggested that in considering the sentence to be imposed after revocation, the court should consider a probationer's "relationship toward his family, his attitude toward the fulfillment of financial obligations ... and—of course—whether there have been specific and *significant violations* of the conditions of the probation or parole." *Gagnon,* 411 U.S. at 784 n. 8, 93 S.Ct. at 1761 n. 8 (emphasis added). Morin has maintained contact with his sister, paid the fines imposed by the court, abided by the special probation conditions as to the hours he may spend at his video and book stores, and with the exception of this one technical violation, fulfilled the requirements of the probation order. He has committed no *significant violation.* In fact, subsequent to the incident at issue, Morin made another trip to visit his sister and a trip to California, and on both occasions, submitted written requests and received written approvals in advance. Frost indicated that Morin fully complied with his personal requirements on these two trips, and that he was satisfied that Morin followed all the proper procedures. Thus, Morin's sin of omission did not reflect the existence of a serious underlying problem that could only be corrected by drastic action on the part of the government. To revoke probation for a first technical violation, when subsequent behavior proves to be fully satisfactory, seems clearly contrary to the spirit and intent of *Gagnon.* Moreover, relevant or not, one cannot help but speculate that we could put our limited prisons to far more constructive use.

Finally, the majority concludes that "imprisonment is necessary to vindicate the authority of the court and the credibility of its orders." Maj. Op. at 333. In doing so, the majority pays lip service to the American Bar Association Standards for Criminal Justice and to the Model Penal Code. However, my colleagues unwittingly ignore the overall thrust and purpose of the rules they seek to follow. The ABA, like the

---

12. The judge gave Morin's health some grudging consideration at his earlier sentencing hearings. At the food stamp sentencing, the judge stated, "I do not wish to impose upon the officials who would be responsible for your wellbeing during the period of any incarceration what would be the great responsibility, the very considerable expense and a considerable risk involved in seeing that you received the very extensive medical treatment that you need at least on the basis of three times a week. As much out of consideration for them as out of consideration for you, I am not going to subject you to a certain term of incarceration." Later, the judge said that at the time of the unauthorized copying sentencing, he was "naturally reluctant to put someone in a state of incarceration where it may impose an unusual risk to one's physical well being because of his medical condition, and [did] not want[ ] to burden the penal system with having to provide for continuous dialysis treatment with this individual." The record does not indicate that, following the second sentencing, there was any improvement in Morin's physical condition that would reduce the danger posed by imprisonment.

**340**

drafters of the Model Penal Code,[13] recommends that "The court should not impose a sentence of total confinement upon revocation unless: i) the defendant has been convicted of another crime ...; or ii) the defendant's conduct indicates that it is likely that he will commit another crime if he is not imprisoned; or iii) such a sentence is essential to vindicate the authority of the court."[14] The majority does not attempt to justify its affirmance of the district court's actions on the first two grounds, and clearly it could not do so. Instead, it relies exclusively on the "vindication of authority" argument. However, my colleagues fail to explain why it is necessary to imprison Morin for two years in order to vindicate the authority of the court. Instead, they resort to phrases such as: "Morin played fast and loose with his reporting requirements; ... Morin, however, has responded by treating the court's conditions with disdain. He will not now be heard to complain that the cupboard is bare." Maj. Op. at 333.

The majority's conclusory characterizations are no substitute for the careful factual analysis contemplated by the ABA standards and the Model Penal Code. Clearly, the rules envision serious contemptuous conduct on the part of the probationer, not the type of technical violation which Morin engaged in. In this case, the probationer did not flagrantly violate an order of the court. To the contrary, he reported to his probation officer his intent to travel outside the judicial district of Maine, and received preliminary oral permission to do so. His mistake was his failure to follow the unwritten bureaucratic procedure that reflected the personal policy of an individual probation officer. He failed to put his request in writing, an error which does not in any way seriously undermine the authority of the court or warrant the imposition of a two-year prison sentence.

In short, Morin failed to write a letter on one occasion. Because his new probation officer had a personal policy which he did not consider important enough to embody in a written notice, Morin will be imprisoned for two years, or perhaps will fail to survive his imprisonment. I am astonished that the majority can seriously suggest that Morin's deviation from Frost's personal rule renders it "essential" that he be imprisoned in order "to vindicate the authority of the court." In my opinion, the district court's action clearly exceeds the bounds of fairness and due process. For the reasons stated above, I respectfully dissent.

---

**13.** Model Penal Code § 301.3(2) (1985).

**14.** American Bar Association, III *Standards for Criminal Justice,* Standards 18–7.3(c), at 18–508 (2d ed. 1980).