USCA1 Opinion

 

 August 25, 1995 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-2304 UNITED STATES OF AMERICA, Appellee, v. ARCHIE M. WHALEN, Defendant, Appellant. ____________________ ERRATA SHEET The opinion of this court issued on August 24, 1995 is amended as follows: On page 4, line 13: substitute "III." for "II." On page 12, line 5: delete the first "other" to appear on that line.  August 24, 1995 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-2304 UNITED STATES OF AMERICA, Appellee, v. ARCHIE M. WHALEN, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________  ____________________ Before Torruella, Chief Judge, ___________ Lynch, Circuit Judge, _____________ and Casellas,* District Judge ______________ ____________________ William Maselli for defendant, appellant Archie M. Whalen. _______________ F. Mark Terison, with whom Jay P. McCloskey, United States _______________ ________________ Attorney, and James L. McCarthy, Assistant United States _________________ Attorney, were on brief for the United States.  ____________________ ____________________  ____________________ *Of the District of Puerto Rico, sitting by designation. Per Curiam. Archie Whalen, while serving a federal Per Curiam. __________ three-year term of supervised release, was arrested on state charges of assaulting and criminally threatening his wife and children. That arrest led to a revocation of his supervised release by the district court and a sentence of six months imprisonment and an additional two-year term of supervised release. Whalen appeals, claiming that the district court's findings were factually unsupported. We affirm. I. Background __________ In August 1991, Whalen was convicted in federal court of various firearms offenses and sentenced to a two- year prison term, to be followed by a three-year term of supervised release. The supervised release term began in April 1993.1 One of the conditions of the release was that Whalen not commit any new crimes, whether state, federal, or local. On October 26, 1994, the defendant was arrested in New York on state charges resulting from a violent domestic dispute with his wife Christina Whalen and her children. Consequently, a petition to revoke Whalen's supervised release was filed. The petition alleged that Whalen had violated New York penal law by (1) threatening his wife and her children; (2) physically assaulting his wife; and (3)  ____________________ 1On January 5, 1993, the custodial portion of the sentence was reduced to 21 months, thus allowing for the release date in April. -3- attempting to contact his wife in violation of a state court order, issued following his arrest, directing him not to do so. After an evidentiary hearing at which the government presented, inter alia, sworn statements by ___________ Christina Whalen attesting to the assault, the district court found by a preponderance of the evidence that Archie Whalen had committed the acts alleged and ordered that his release be revoked. II. Mootness ________ During the pendency of this appeal, Whalen completed his prison term and resumed a term of supervised release. Apparently, shortly after being released from his six-month prison term, Whalen again assaulted his wife. On July 27, 1995, the district court again revoked Whalen's supervised release and imposed a sentence of 12 months, with no further term of supervised release. The government now argues that this second revocation makes the controversy over the first revocation moot because the first revocation will no longer have any legally significant effect on Whalen in the future. As the government points out, however, there is at least one set of circumstances in which the first revocation could affect Whalen in a legally significant way. Under the Guidelines, two criminal history points are assessed if the defendant commits a federal offense within -4- two years of his release from imprisonment on a sentence of at least 60 days. United States Sentencing Commission, Guidelines Manual, 4A1.1(e). A prison term served for __________________ revocation of supervised release "may affect the points for 4A1.1(e) in respect to the recency of last release from confinement." U.S.S.G. 4A1.2(k)(2)(A). Should the second revocation of supervised release be vacated on appeal and Whalen commit an offense within two years of his release date on the first revocation, the first revocation will affect the calculation of Whalen's release date for purposes of applying the criminal history provisions of the Sentencing Guidelines. Thus there could be a benefit to Whalen should the first revocation be vacated. In light of such a potential collateral consequence, see Carafas v. LaVallee, 391 U.S. ___ ____________________ 234, 237 (1968), the controversy is not moot. III. Evidentiary Sufficiency _______________________ A. The Evidence ____________ The domestic violence incident took place when the Whalens were in their car searching for Christina Whalen's son Robert, who had run away following a dispute with the defendant. Embroiled in an argument with her husband, Christina Whalen got out of the car and refused to get back in. Archie Whalen dragged her back into the car, kicking her over and over in the leg, and repeatedly closing the car door on her leg and hip area. Christina Whalen was later treated -5- at a local hospital emergency room for injuries suffered from the assault. Archie Whalen was arrested. The next day a local court ordered Archie Whalen not to have any contact with Christina Whalen. In violation of the order, he promptly telephoned his wife. The key pieces of documentary evidence introduced at the revocation hearing were: (1) Christina Whalen's sworn statement dated October 27, 1994 (attached to the New York Prosecutor's Information) concerning the events of October 26, 1994; (2) Christina Whalen's sworn statement dated October 28, 1994 concerning the defendant's attempt to call her from jail on that day; and (3) Handwritten notes of Brenda Catterson (a social worker for the Maine Dept. of Human Services) concerning a phone conversation she had with Christina Whalen on October 27, 1994. The district judge heard testimony from six witnesses: (1) William Beck, Whalen's probation officer from 1991-1994; (2) James Gardella, Whalen's probation officer since 1994 (when Whalen moved to New York); (3) Christina Whalen, the defendant's wife; (4) Brenda Catterson, a social worker in the Maine Child Protective Services Division of the Maine Department of Human Services; (5) Marie Kelly Harding, a supervisor in the Child Protective Services Division of the Maine Department of Human Services; and (6) Defendant Archie Whalen. Because Archie Whalen claims that this evidence was not adequate, this evidence is summarized below. 1. The October 27 Sworn Statement. ______________________________ -6- This sworn statement by Christina Whalen describes the assault of October 26: On or about October 26, 1994 at around 6:15 PM, my husband Archie Whalen during an on-going argument threatened me and my children with physical harm or death if I didn't get in the car with him and go looking for my son, Robert Kealy, who had left the house earlier after having a verbal dispute with him. I was dragged into the vehicle by Archie Whalen, and was repeatedly kicked in the leg by him when I attempted to exit the vehicle. At one point, I was able to escape from the car, and Archie tried to pull me back into the vehicle. During that time, Archie repeatedly closed the car door on my leg and hip area, causing great pain and bruising.  2. The October 28 Sworn Statement. ______________________________ Christina Whalen declares in this statement that she received a collect call from the defendant on October 27, after he had been ordered not to contact her. When she recognized that the call was from her husband, she "was terrified to hear his voice and immediately hung up the telephone." 3. Brenda Catterson's Handwritten Notes. ____________________________________ These notes reflect a telephone conversation between Catterson and Christina Whalen on October 27, 1994. Christina Whalen had left a message at the Department of Human Services that she was having an "emergency" and wanted someone to call back. When Catterson called, Christina Whalen told her that she had confronted defendant about his relationship with her daughter Melissa, and that he became -7- "verbally belligerent." Her son Robert entered the room and attempted to defend his mother and warned defendant that he had better not harm her. The defendant responded by telling Robert that "he'd break every bone in his body and kill all three of them before he'd go back to prison." 4. William Beck's Testimony. ________________________ Beck, defendant's original probation officer, received a phone call from Christina Whalen on October 27, 1994. She told him that defendant had been arrested and that she was upset and worried about the defendant's relationship with her children. On October 28, she called Beck again saying that the defendant had tried to call her collect from jail, but that she had hung up immediately upon recognizing his voice. 5. James Gardella's Testimony. __________________________ Gardella, defendant's probation officer in New York, learned from a local assistant district attorney on October 27, 1994, that the defendant had been arrested. Upon receiving the news, Gardella then interviewed Christina Whalen and her two children. Christina Whalen told Gardella that the defendant had kicked her and offered to show him the bruises on her leg. She also told Gardella that she was frightened of defendant, and was afraid of the repercussions of having filed charges against him. Gardella asked Robert whether Archie Whalen had ever threatened him. Robert -8- replied that the defendant had indeed threatened to "break every bone in his body." In speaking with Melissa, Gardella learned that the defendant had offered to buy her beer, and that he had told her that he, not her mother, was the only person Melissa should trust. -9- 6. Brenda Catterson's Testimony. ____________________________ Catterson's testimony basically repeated the contents of her handwritten notes of the telephone call from Christina Whalen on October 27, 1994. 7. Marie Kelly Harding's Testimony. _______________________________ Harding testified about a conversation in March 1994, before the incident, in which Christina Whalen had expressed that she was frightened of the defendant, that she feared he would kill her, and that she was worried that he might harm her children. 8. Christina Whalen's Testimony. ____________________________ Christina Whalen, in testimony, recanted her prior written statements. She testified that she believed that Archie Whalen had not intentionally tried to injure her on October 26, and that the bruises on her leg resulted when he accidentally closed the car door on her leg. She said that she had been out of control that evening, and had even told the defendant and her daughter that she wanted to kill herself. She testified that she had made up the story about being assaulted only after the police officer who arrived at the scene threatened to place her in jail and take away her children if she failed to tell the truth about why she and her husband were arguing. As for the defendant's attempt to telephone her on October 27 in violation of a court order, -10- she testified that she had given the defendant permission to call, because her son Robert wanted to talk to him. 9. Defendant's Testimony. _____________________ Archie Whalen denied assaulting his wife. He admitted threatening to "break every bone" in Robert's body, but explained that "[i]t was a figure of speech to let him know how serious I was about him not using drugs." B. Reliability of the Evidence ___________________________ Archie Whalen contends that because Christina backed away at the revocation hearing from her prior sworn statements, those sworn statements and her oral statements to Beck, Gardella, and Catterson all lacked sufficient indicia of reliability to form a basis for revocation. Archie Whalen argues there was no other evidence supporting the government's petition and so the district court's decision should be reversed. Whalen is wrong. The standard of proof facing the government in a revocation proceeding is a preponderance of the evidence. United States v. Portalla, 985 F.2d 621, 622 (1st Cir. 1993). _________________________ On appellate review, the evidence must be viewed in the light most favorable to the government. Id. A district court's ___ revocation decision "will not be reversed absent a clear -11- showing of an abuse of discretion." United States v. Morin, ______________________ 889 F.2d 328, 331 (1st Cir. 1989).2 As Whalen appropriately concedes, the Rules of Evidence do not apply in a revocation hearing. See Portalla, ___ ________ 985 F.2d at 622. The evidence relied upon by the court must be reliable, and the district court has broad discretion to decide questions of reliability, as well as questions of witness credibility. Id. Here, it was more than reasonable ___ for the district court to conclude the evidence was reliable. The written statements of Christina Whalen describing the events of October 26-27, 1994 were made under oath and were corroborated by the testimony of Beck, Gardella, and Catterson. Cf. United States v. Zuleta-Alvarez, 922 F.2d 33, ___ _______________________________ 37 (1st Cir. 1990) (holding corroborated statements made under oath to be reliable), cert. denied, 500 U.S. 927 ____________  ____________________ 2As a threshold matter, it does not appear that the defendant raised any objection based on unreliability of evidence at the hearing. Instead, the defendant's objections seemed to rest on relevance grounds. See, e.g., December 14, _________ 1994 Revocation Hearing Transcript at 15 ("Your Honor, I realize the rules of evidence don't apply here, but I would ask the court to exercise its discretion to limit the evidence today to information tending to prove or disprove the violations charged in the revocation report."); see also ________ December 14, 1994 Revocation Hearing Transcript at 28 (arguing that Christina Whalen's sworn statements are "not helpful" to show that the conduct occurred); December 14, 1994 Revocation Hearing Transcript at 63 (asking court to "limit the evidence to the violations alleged"); December 14, 1994 Revocation Hearing Transcript at 65 (same).  Accordingly, the district court's conclusions may be subject only to plain error review. We need not resolve that question here because no error occurred. -12- (1991). Furthermore, Christina Whalen verified at the revocation hearing that the written statements were in fact her own. Indeed, she repeated at the hearing that the defendant had slammed a car door on her leg; she only denied believing that he had intentionally done so. Similarly, she never denied at the hearing that the defendant had attempted to call her in violation of a court order on October 27; she claimed only that she had invited him to do so. Catterson's notes were a contemporaneous record of an "emergency" telephone conversation with Christina Whalen, and the contents were fully verified by Catterson's testimony. Additionally, the statement in the notes that the defendant had threatened to "break every bone" in Robert's body was corroborated by the testimony of Gardella. Indeed, the defendant himself admitted to making that statement. Finally, Christina Whalen's recantation of her prior written statements at the revocation hearing did not render those sworn statements unreliable. The district court had far-ranging latitude to credit or discredit her courtroom testimony, and there is no basis for disturbing that credibility determination here. See Portalla, 985 F.2d at ___ ________ 624. The district court was well aware that the evidence at the hearing encompassed "a very strong mixture of truth and fiction," and decided that the defendant had in fact committed the violations described. -13- This was far from unreasonable. The court could sensibly have determined, for example, that Christina Whalen's in-court change of heart concerning the alleged assault was attributable to concern for her own safety. The testimony of several other witnesses (particularly Gardella) established that she feared the defendant and was particularly afraid of retaliation for her filing of assault charges against him. This pattern of behavior among women in abusive relationships has been recognized in a growing body of academic literature. See generally Eva Jefferson ___ _________ Paterson, How The Legal System Responds to Battered Women, in _______________________________________________ __ Battered Women 79, 86 (Donna M. Moore ed., 1979) (many women _______________ change their minds about pressing charges out of fear of further violence from the assailant); see also Lenore E. _________ Walker, The Battered Woman Syndrome (1984) (analyzing the _____________________________ psychological characteristics of women in abusive relationships). The district court clearly did not abuse its discretion in concluding that "there is no way . . . that Christina Whalen could make this scenario up out of whole cloth, and particularly with the background evidence that is here to support it." The record, viewed in the light most favorable to the government, amply demonstrates that the district court did not abuse its discretion in revoking defendant's supervised release. See United States v. Gallo, 20 F.3d 7, ___ ______________________ -14- 14 (1st Cir. 1994) ("[I]t is enough if the proof, reasonably viewed, satisfies the court that a violation occurred."). Finally, the defendant argues in rather cursory fashion that the district court failed adequately to disclose in its ruling the precise basis for his revocation decision. This argument is without merit. The district court explained its ruling from the bench. The court clearly announced its conclusion that the defendant had committed all of the violations of New York penal law alleged in the revocation petition, namely: "that the defendant did in fact threaten his wife and children, whether he meant it or not, and that he did in fact cause his wife to be assaulted and he did in fact telephone his wife in violation of the order of protection." This clear statement, preceded by an elaboration of the court's interpretation of the evidence that had been presented, gave the defendant ample notice of the reasons that his supervised release was being revoked. Affirmed. ________ -15-