UNITED STATES, Appellee,

v.

James William GIANNETTA,
Defendant, Appellant.

No. 89–2005.

United States Court of Appeals,
First Circuit.

Heard May 9, 1990.
Decided July 20, 1990.

Judy Potter, Portland, Me., for defendant, appellant.

Margaret D. McGaughey, Asst. U.S. Atty., Portland, Me., with whom Richard S. Cohen, U.S. Atty., Augusta, Me., and William H. Browder, Jr., Asst. U.S. Atty., Bangor, Me., were on brief, for appellee.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is an appeal from an order of the district court revoking defendant-appellant James Giannetta's probation. 717 F.Supp. 926. Giannetta raises a number of fourth amendment challenges regarding two searches of his residence that were performed by his probation officer and that uncovered much of the evidence used to support the revocation. For the reasons that follow, we affirm.

## I. BACKGROUND

In December, 1986 and March, 1987, Giannetta pled guilty to charges of conspiracy to possess with intent to distribute approximately two kilograms of cocaine and conspiracy to import approximately 8,000 pounds of hashish. At a deferred sentencing hearing in February, 1988, Giannetta was placed on probation for two concurrent terms of five years on each charge. The relatively mild sentence was due to Giannetta's extensive cooperation with law enforcement authorities in other drug trafficking investigations.

Fourteen standard conditions were imposed as part of Giannetta's probation agreement, including bans on unauthorized travel outside the judicial district of Maine, association with any persons convicted of a felony or engaged in criminal activity, and the commission of any crimes during the term of probation supervision. In addition, a special condition of probation required that Giannetta "at all times during his period of probation, readily submit to a search of his residence and of any other premises under his dominion and control, by his supervising probation officer, upon the officer's request." In imposing the special search condition, the district court expressed concern about Giannetta's admitted attraction to the risk and excitement of criminal activity and explicitly stated his intention to subject Giannetta to rigorous scrutiny and supervision by his probation officer.

Shortly after the imposition of probation, Giannetta's probation officer, Vincent Frost, began to suspect that Giannetta was violating several conditions of his probation. Frost's suspicions rested on information received from South Portland Police Detective Reed Barker as well as on the results of his own investigation and surveillance of Giannetta. From this information, Frost concluded that Giannetta had probably violated his probation conditions in the following ways. First, evidence indicated that Giannetta was engaged in the crime of automobile insurance fraud—stripping cars and reporting them stolen so that he could collect the insurance, purchase the salvage rights and then rebuild the cars with the stripped parts. Second, Giannetta appeared to be involved in a fraudulent credit card scheme involving the purchase of items at one store on credit and the return of them at another for cash. Third, in the course of investigating this credit card scheme, Frost also learned that Giannetta had violated the probation condition prohibiting travel outside the judicial district of Maine without authorization. Fourth, Frost discovered that Giannetta had made false statements on a loan application involving the purchase of a Pontiac Fiero. Investigation of this crime also uncovered instances of unauthorized travel by Giannetta outside Maine.

In addition to these activities, Frost acquired information indicating several other probation violations. He assembled telephone documentation of unauthorized contact by Giannetta with at least one convicted felon. He received informant information that Giannetta had been seen in Florida (unauthorized travel) and always carried a gun (illegal for a felon). He observed Giannetta driving (unlawfully) after his license had been suspended. And he personally received overtures from Giannetta that he interpreted as an attempt to

bribe him for permission to travel outside the district of Maine.

Because of the information indicating numerous probation violations,[1] Frost, accompanied by Detective Barker, conducted an extensive search of Giannetta's residence on June 30, 1988. The search was undertaken pursuant to the probation search condition to look for evidence of the suspected violations. It uncovered, among other things: a false identification card; an envelope containing blank birth certificates, seals and blank identification cards; a large number of bank statements and checks for different accounts in different names at different banks; hundreds of charge slips; and notes containing various bank account information. Believing these items to be evidence of widespread bank fraud, Frost seized them. He also seized other documents and papers that he suspected could constitute or contain evidence of bank fraud, credit card fraud, or automobile insurance fraud. He reviewed the seized items the following day and then departed on a three-week vacation.

Upon returning from vacation, Frost enlisted the assistance of the Federal Bureau of Investigation ("FBI") and continued his investigation. Based on the investigation's results and the items seized in the June 30 search, he obtained a warrant for Giannetta's arrest for probation violations. Giannetta was arrested on September 2, 1988 at his house, at which time Frost conducted a second extensive search pursuant to the probation search condition and seized a number of additional items, primarily documents and papers, also believed to be evidence of probation violations.

Probation revocation proceedings subsequently were held before the district court to determine: first, whether Giannetta had violated any conditions of his probation; and second, what sanctions to impose if the court found that Giannetta had done so. During these proceedings, Giannetta moved on fourth amendment grounds to suppress the items seized by Frost in the

two searches, arguing that Frost had lacked probable cause either to search Giannetta's residence or to seize any items from it. Giannetta also challenged the broad scope of both the searches and the seizures. The district court denied the motion to suppress. It ruled that under *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), Frost needed only reasonable suspicion to search and seize evidence from a probationer's residence pursuant to a probation search condition and that Frost had met this standard. The court also upheld the scope of the searches and seizures.

The district court then determined that Giannetta had committed serious violations of a number of his probation conditions. The court found, *inter alia*, that Giannetta had traveled outside the judicial district numerous times without authorization, committed bank and automobile insurance fraud, filed a false automobile loan application and associated with persons convicted of felonies. The court based its determinations on the results of the two searches, the information assembled by Frost prior to the searches and the testimony of Keith Lorentsen and Alice Cuneo—two associates of Giannetta who testified at length at the revocation hearing as to Giannetta's fraudulent bank and insurance schemes. On the basis of these violations, the court revoked Giannetta's probation and sentenced him to fifteen years in prison on the original drug offenses. Giannetta now appeals, raising a host of fourth amendment challenges to the searches and seizures conducted by Frost.

## II. CONSTITUTIONAL AVOIDANCE

■ At the outset, we consider the government's contention that several of the probation violations found by the district court were supported by evidence independent of the searches conducted by Frost. Because these violations would be sufficient alone to support revocation of Giannetta's probation, the government argues

---

1. Giannetta strives mightily in his brief to cast doubt on the strength of the factual evidence underlying Frost's suspicions of numerous probation violations. We have considered these arguments and, finding them largely unpersuasive, see no need to discuss each individually.

that we need not reach the fourth amendment issues presented by the searches and seizures.

Although it may be true that certain of the non-search-related violations, such as the unauthorized travel violations, could be sufficient alone to ground revocation, *see United States v. Morin*, 889 F.2d 328, 331–32 (1st Cir.1989), it is equally true that a trial judge's decision to revoke upon finding probation violations is discretionary rather than mandatory. Given the number of probation violations in this case that rested on evidence uncovered in the challenged searches, we are unwilling to speculate whether the trial judge would still have exercised his discretion and revoked Giannetta's probation in the absence of the search results. *See Higdon v. United States*, 627 F.2d 893, 900 (9th Cir.1980). Put another way, we cannot conclude that the search results did not contribute to the judge's decision to revoke Giannetta's probation or to impose a fifteen-year prison sentence. *Cf. Satterwhite v. Texas*, 486 U.S. 249, 256–59, 108 S.Ct. 1792, 1797–99, 100 L.Ed.2d 284 (1988) (phrasing the harmless error inquiry in a capital sentencing proceeding as whether the constitutional error contributed to the verdict). Consequently, we must reach the fourth amendment issues presented in this appeal.

## III. CONSTITUTIONALITY OF THE SEARCH

### A. *Applicable Search Standard*

■ Giannetta first contends that Frost needed probable cause before he could initiate a probation search and that the district court erred in applying the lesser reasonable suspicion standard. We disagree.

*Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), controls our consideration of this issue. In *Griffin*, the Supreme Court upheld the constitutionality of a warrantless search performed by a probation officer pursuant to a state regulation that authorized such searches on the basis of reasonable suspicion and that articulated factors to be considered in determining the existence of reasonable suspicion. *See id.* at 872–80, 107 S.Ct. at 3167–72. The Court concluded that "special needs" of the probationary system, particularly the need to supervise probationers closely, justified warrantless searches based on reasonable suspicion rather than probable cause. *See id.* Accordingly, the Court upheld the constitutionality of the state regulation and upheld the search because it had been conducted pursuant to the regulation. *See id.* at 880, 107 S.Ct. at 3171.

Giannetta attempts to distinguish *Griffin* by arguing that unlike in *Griffin*, no regulatory scheme existed here. Thus, he contends, the reasonable suspicion standard does not apply, and probable cause remains the governing constitutional threshold for searches. We are not persuaded.

Although it is true that the search in *Griffin* was executed as part of a regulatory scheme, we do not read *Griffin* as approving only probation searches conducted pursuant to a legislative or administrative framework. Concededly, such a regulatory framework provides guidance to probation officers and furnishes certain search constraints. Similar guidance and constraints, however, are provided where, as here, a sentencing judge narrowly tailors the need for and scope of any probation search conditions to the circumstances of an individual case. In such a setting, probation searches based on reasonable suspicion are supported by the same "special needs" justifications and have the same characteristics of reasonableness as the search upheld in *Griffin*. *See United States v. Schoenrock*, 868 F.2d 289, 292–93 (8th Cir.1989); 4 W. LaFave, *Search and Seizure* § 10.10 (2d ed. Supp.1990).

We are satisfied from our review of the record that the district court imposed the search condition at issue here after careful consideration of Giannetta's particular circumstances. Giannetta pled guilty to the commission of drug trafficking offenses of substantial scope and complexity—offenses that typically would warrant a lengthy prison sentence. Moreover, Giannetta admitted harboring a strong attraction to the excitement offered by criminal activity.

These circumstances presented more than an average risk that Giannetta would revert to his prior criminal ways. Accordingly, the extra measure of supervision furnished by a probation search condition was justified. We acknowledge that the search condition imposed here was broader than some search conditions that have been considered and approved by other circuits. *See Schoenrock*, 868 F.2d at 290–93 (approving a condition that authorized probation officers to search for drugs or alcohol); *United States v. Williams*, 787 F.2d 1182, 1185 (7th Cir.1986) (approving a urinalysis and drug screening condition). Giannetta's criminal propensities, however, were not strictly limited to drug-related activities, and thus a broader search condition was warranted.

■ We are more troubled by the search condition's failure to contain a reasonableness limitation. On its face, the condition allows a search by a probation officer with or without reasonable suspicion, which would appear to conflict with the dictates of *Griffin*. Although this flaw theoretically renders the probation search condition overbroad, the absence of a reasonableness limitation is not objectionable so long as the decision to search was in fact narrowly and properly made on the basis of reasonable suspicion, an inquiry to which we now turn.[2] *See United States v. Jeffers*, 573 F.2d 1074, 1075 (9th Cir.1978) (per curiam); *see also Schoenrock*, 868 F.2d at 292.

### B. Existence of Reasonable Suspicion

■ The Supreme Court has defined reasonable suspicion as a reasonable belief based on "specific and articulable facts," rather than a mere inchoate and unparticularized suspicion or hunch. *Maryland v. Buie*, —— U.S. ——, 110 S.Ct. 1093, 1097–98, 108 L.Ed.2d 276 (1990). More particularly, the Court has held that information received from a police detective that there "were or might be guns" in a probationer's apartment was sufficient to furnish reasonable grounds to search, even though there was no indication whether the tip was based on the detective's firsthand knowledge, or if not, whether the source was reliable. *See Griffin*, 483 U.S. at 871, 878–80, 107 S.Ct. at 3166, 3170–71.

Measured against either of these benchmarks, Frost had reasonable suspicion to search Giannetta's residence. As we have already recited, prior to the June 30 search,[3] Frost had assembled evidence of repeated unauthorized travel by Giannetta outside the judicial district of Maine, contact with convicted felons, the filing of a false automobile loan application, credit card fraud and automobile insurance fraud. This evidence clearly provided reasonable grounds for Frost to suspect numerous violations by Giannetta of his probation conditions and to justify a search of Giannetta's residence pursuant to the probation search condition for more concrete evidence of these violations.[4]

### C. Scope of Search

■ Giannetta's next challenge is to the scope of the search performed by Frost. There is no dispute that Frost conducted an extremely thorough, comprehensive search of Giannetta's residence, looking under

2. We express no opinion as to whether the type of broad search condition involved here could routinely be imposed on all probationers. We are satisfied that such a condition was imposed in this case only after careful consideration of the unique circumstances of this probationer.

3. We focus our analysis on the June 30 search because even Giannetta does not appear to contest that if the June 30 search was valid, it necessarily follows that the substantially similar September 2 search was valid as well. We continue to focus on the June 30 search throughout the remainder of the opinion.

4. Even in the absence of reasonable suspicion, the government contends that Giannetta's "ac-

ceptance" of the probation agreement's search condition constituted a general consent to search for purposes of the fourth amendment. Because we find Frost to have had adequate grounds for reasonable suspicion, we need not reach the issue of consent. We observe, however, that a question of coercion would arise as to any contention that "agreement" to a probation search condition constitutes a general consent to search. *See United States v. Pierce*, 561 F.2d 735, 739 (9th Cir.1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1486, 55 L.Ed.2d 516 (1978); *United States v. Smith*, 395 F.Supp. 1155, 1156–57 (W.D.N.Y.1975).

beds, checking pockets in clothing, going through file cabinets and files, opening boxes, and the like. Giannetta contends that this search was excessively broad in scope and amounted to an unconstitutional general search of the premises. We are not persuaded.

■ It is well accepted that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572 (1982). Any container may be searched if it is reasonable to believe that the container could conceal the object of the search. *See, e.g., United States v. Doherty*, 867 F.2d 47, 65–66 (1st Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989); *United States v. Gray*, 814 F.2d 49, 51 (1st Cir.1987).

As discussed *supra,* Frost had reasonable suspicion to search Giannetta's residence on June 30 for evidence pertaining to automobile insurance fraud, credit card fraud and unauthorized travel. It was reasonable for Frost to believe that such evidence would most likely be in the form of documents or receipts, such as photocopies of filed insurance claims, credit card receipts, and similar items. Consequently, Frost, on the basis of reasonable suspicion, had the right to search anywhere such documents could be hidden, which would include pockets in clothing, boxes, file cabinets and files. As to document searches especially, the easily concealed nature of the evidence means that quite broad searches are permitted. Courts have regularly held that in searches for papers, the police may look through notebooks, journals, briefcases, file cabinets, files and similar items and briefly peruse their contents to determine whether they are among the documentary items to be seized. *See, e.g., United States v. Santarelli*, 778 F.2d 609, 615–16 (11th Cir.1985) ("Given the fact that the search warrant entitled the agents to search for documents ... it is clear that the agents were entitled to examine each document in the bedroom or in the filing cabinet to determine whether it constituted evidence that they were entitled to seize under the warrant."); *United States v. Issacs*, 708 F.2d 1365, 1368–70 (9th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983); *United States v. Christine*, 687 F.2d 749, 760 (3d Cir.1982); *see also United States v. Fawole*, 785 F.2d 1141, 1145 (4th Cir.1986). There is no indication in the record that Frost did anything more intrusive than this in his search of Giannetta's residence. Moreover, early in the search, Frost uncovered false identification materials, evidence of numerous bank accounts held in different names at different banks and other items that supported a reasonable suspicion that Giannetta also was engaged in bank fraud. Upon discovering this material, Frost was justified in expanding the scope of his probation search to look for any documents that could constitute evidence of bank fraud. This further buttressed his authority to look through file cabinets, files and Giannetta's papers in general. We find no constitutional infirmity in the scope of Frost's search.[5]

## IV. CONSTITUTIONALITY OF THE SEIZURES

During the course of the June 30 search, Frost discovered what he perceived to be indications of widespread bank fraud. Accordingly, he seized a considerable number

---

5. In challenging the scope of the search conducted by Frost, Giannetta cites a number of cases in which we have struck down warrants authorizing document searches on the ground that the warrants were insufficiently particular in describing the items to be seized. *See, e.g., United States v. Roche*, 614 F.2d 6 (1st Cir.1980); *Application of Lafayette Academy, Inc.*, 610 F.2d 1 (1st Cir.1979). These cases, however, addressed the inadequacy of the description contained in the warrant; they did not address the execution of the warrant during the course of the search. *See United States v. Abrams*, 615 F.2d 541, 550 (1st Cir.1980) (Campbell, J., concurring). As a result, the cases are inapplicable here. Due to the absence of a warrant requirement, Giannetta cannot make a particularity challenge. His challenge must be to the execution of the search.

of documents, including checks, bank statements, notes containing bank account information, and blank identification materials, as well as calendars, photographs, some computer diskettes and other items that he interpreted as constituting or containing evidence of bank fraud. Separate from his challenge to the scope of the search, Giannetta contests the validity of Frost's extensive seizures.

## A. *Applicable Seizure Standard*

Because of the absence of a warrant requirement, the most appropriate seizure standard appears to come from the rules governing "plain view" seizures. The "plain view" doctrine typically is invoked in situations in which the police have a valid warrant to search a particular area for certain specified items, and in the course of the search, come across some other object of incriminating character. *See Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971). The plain view doctrine allows police to seize the object, even though it is not specified in the warrant, if two requirements are met. First, the police must have "a prior justification for being in a position to see the item in plain view." *United States v. Johnston,* 784 F.2d 416, 419 (1st Cir. 1986). Phrased another way, the police must not have exceeded the permitted scope of their search in uncovering the item. Second, the incriminating nature of the item must be "immediately apparent" to the seizing agent. *See id.* "Immediately apparent" has been defined as probable cause to believe the item is contraband or evidence of a crime. *See United States v. Rutkowski,* 877 F.2d 139, 142 (1st Cir. 1989); *United States v. Doherty,* 867 F.2d 47, 66 (1st Cir.1989); *see also Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).[6]

We have already upheld the scope of Frost's search. Thus, it is the second re-

quirement of immediate appearance of criminality, or probable cause, that constitutes the crux of the seizure issue presented in this case.

## B. *Existence of Probable Cause*

In upholding the seizures made by Frost, the district court declined to require probable cause to seize. Although it noted later in its opinion that probable cause had existed as to many of the documents seized, the court cited *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, for the proposition that reasonable suspicion is sufficient to support seizures made in the course of a probation search.

*Griffin,* however, only addressed the standard required to search; it did not address the standard required to seize. Although fourth amendment cases sometimes refer indiscriminately to searches and seizures, "there are important differences between the two." Seizures threaten the fourth amendment interest in retaining possession of property. Searches threaten the interest in maintaining personal privacy. *Texas v. Brown,* 460 U.S. 730, 747, 103 S.Ct. 1535, 1546, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring); *see also Arizona v. Hicks,* 480 U.S. 321, 328, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987); *cf. O'Connor v. Ortega,* 480 U.S. 709, 729 n. *, 107 S.Ct. 1492, 1503 n. *, 94 L.Ed.2d 714 (1987) (plurality op.) (declining to reach the issue of the appropriate fourth amendment standard for seizures made pursuant to a warrantless workspace search based on reasonable suspicion). *But see United States v. Cardona,* 903 F.2d 60, 65–65 (1st Cir.1990) (dismissing any attempt to distinguish between searches and seizures as creating only an "artificial distinction").

Although we take note of this difference between searches and seizures, this case does not require us to decide how, if at all, the difference affects the standard

---

6. Courts also historically have required that the discovery of the item be inadvertent—i.e., that the searching agents not suspect in advance that they would find the item. The justifications for the inadvertence requirement seem inapplicable to warrantless probation searches. In any

event, the Supreme Court recently has stated that "inadvertence" is not a necessary condition of plain view seizure. *See Horton v. California,* — U.S. —, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

governing seizures made pursuant to probation searches. As we discuss below, Frost met the more stringent probable cause standard with respect to the bulk of the items seized.

■ Probable cause to support a plain view seizure requires more than "hunch, guesswork, and cop-on-the-beat intuition," but less than proof beyond a reasonable doubt or a "near certainty" that the seized item is incriminating. *United States v. Rutkowski*, 877 F.2d at 142. There must be enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime. *See id.* at 142–43. "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)).

Considered in light of this standard, the record indicates that probable cause existed to seize the majority of the items actually taken by Frost. In reviewing the record, we note that Frost began the search with reasonable grounds to suspect that Giannetta was engaged in automobile insurance fraud and credit card fraud. With these suspicions of financial fraud in mind, Frost immediately discovered a false identification card in an upstairs toilet. Frost then found an envelope containing blank birth certificates, seals and blank identification cards; boxes of checks for accounts held in different names and at different banks; numerous bank statements and account information, again for accounts held in different names at different banks; handwritten notes pertaining to various bank accounts; credit card applications; hundreds of charge slips; and other, similar documentation. We conclude that this material, found on the premises of a man with minimal reported assets, no reported job and who was reasonably suspected of engaging in financial fraud, certainly possessed an immediate appearance of criminality sufficient to create probable cause to believe that incriminating evidence was involved. Frost was justified in seizing the material.

■ Even if Frost had the authority to take the material from the premises, Giannetta nevertheless contends that Frost was not justified in locking the items in his office and then departing on a three-week vacation. Giannetta argues that this conduct violates the dictates of *United States v. LaFrance*, 879 F.2d 1 (1st Cir.1989). We disagree.

In *LaFrance*, we considered the question of whether police who had detained a Federal Express package on reasonable suspicion that it contained drugs took too much time before successfully establishing, via a canine sniff test, full-fledged probable cause to seize the package. One of the factors in our analysis assessed the investigatory diligence of the police officers in their efforts to establish probable cause. *See id.* at 7. Giannetta appears to contend that Frost's departure on vacation violated the requirement of investigatory diligence articulated in *LaFrance*.

■ Even if the analysis of *LaFrance* applied to permit the temporary seizure of a probationer's property from his or her house on only reasonable suspicion, a matter as to which we express no opinion, we find that Frost had *probable cause* at the time of the search to support the seizure of a large number of the items that he actually took. Consequently, *LaFrance*'s requirement of investigatory diligence regarding items detained on merely reasonable suspicion is inapposite. We concede that the record is not sufficiently complete for us to ascertain whether probable cause existed prior to Frost's vacation as to all of the items seized. Giannetta has highlighted in his brief certain items with respect to which he claims probable cause has never been established, and the district court opinion states only that probable cause was established as to "many" of the documents seized. Our review of the record convinces us, however, that probable cause existed as to the most damning evidence, including the checks, the false identification materials and the bank account information. Therefore, even if we excluded the other items seized, the meat of the evidence against Giannetta survives his suppression

challenge. The testimony of Lorentsen and Cuneo also remains to implicate Giannetta in the commission of bank and automobile insurance fraud. Consequently, the revocation of Giannetta's probation does not fail on fourth amendment grounds.[7]

## V. REMAINING ARGUMENTS

Giannetta raises two additional issues that require only brief discussion.

### A. *Psychological and Medical Reports*

■ Giannetta argued to the district court that it should take into account certain psychological and medical problems from which he allegedly suffered in deciding whether to revoke his probation and in deciding the length of the sentence to impose in the event of revocation. To support his position, Giannetta presented, among other evidence, the testimony of his psychologist, Dr. Saunders. The court considered this evidence, but nonetheless decided to revoke probation. Before deciding on the length of the sentence, however, the court committed Giannetta to the custody of the Attorney General pursuant to 18 U.S.C. § 4205(c) for the purpose of having additional medical and psychological evaluations prepared by Bureau of Prisons ("BOP") staff. Upon receiving the BOP report, the court made it part of the Presentence Investigation Report and furnished copies to both sides, with instructions that the BOP report remain confidential among the defendant, his attorney and the government prosecutor. Giannetta requested clarification of the confidentiality order and inquired specifically whether he could share the report with his psychologist Dr. Saunders, presumably for the purpose

of preparing a rebuttal to the BOP report's conclusions, which differed from those of Dr. Saunders. The court denied Giannetta's request to share the report with Dr. Saunders, and Giannetta now raises a host of legal challenges to this denial.

We dispense with this claim fairly quickly. Fed.R.Crim.P. 32 governs disclosure of the Presentence Investigation Report. It states only that the report must be disclosed to the defendant and to the defendant's attorney, which was done here.[8] Giannetta has cited no authority, and we have found none, requiring the district court to allow disclosure of the report to third parties who may be members of a so-called defense "team."[9]

Even if the district court's confidentiality order here were error, we find it to be harmless error. Dr. Saunders was allowed to testify during the revocation proceedings as to his opinion regarding Giannetta's psychological makeup. Moreover, as required, Giannetta and his attorney were given the BOP evaluation and thus were able to determine how it differed from that of Dr. Saunders. There is no indication that Giannetta or his attorney had difficulty understanding the BOP report, which was written in comprehensible English. Giannetta, through his attorney, was given the opportunity to respond to the BOP's conclusions, and did so competently, attempting to highlight perceived flaws in the BOP report. We see no indication that Dr. Saunders' participation would have added much to this process, particularly because he had already presented his views to the court. Consequently, any error committed by the district court in not permitting disclosure of the BOP report to Dr.

---

**7.** We reject Giannetta's implicit argument that because some of the seized evidence might be tainted by the absence of probable cause, all of it should be suppressed. The general rule in this circuit requires suppression of only the evidence seized without probable cause, while allowing use of the rest. *See United States v. Diaz,* 841 F.2d 1, 4 (1st Cir.1988); *United States v. Riggs,* 690 F.2d 298, 300 (1st Cir.1982).

**8.** Fed.R.Crim.P. 32(c)(3) states in pertinent part:
    [B]efore imposing sentence the court shall permit the defendant and the defendant's

counsel to read the report of the presentence investigation exclusive of any recommendation as to sentence.... The court shall afford the defendant and the defendant's counsel an opportunity to comment on the report and, in the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in it.

**9.** We express no opinion as to whether circumstances might exist where the failure to allow such disclosure would constitute error.

Saunders was harmless error. *Cf. United States v. Foss*, 501 F.2d 522, 531 (1st Cir. 1974) (finding the failure to disclose a presentence report to defendant's appellate counsel to be harmless error in light of the fact that the report contained nothing the defendant and his appellate counsel did not already know); *United States v. Lewis*, 743 F.2d 1127, 1128–29 (5th Cir.1984) (per curiam) (similar); *Hanahan v. Luther*, 693 F.2d 629, 633 (7th Cir.1982) (similar), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1013 (1983).

■ We likewise reject Giannetta's claim that it was error for the district court not to permit him access to the notes and records underlying the BOP report's evaluations and not to compel the staff members who wrote the report to appear as witnesses at the sentencing hearing. We have stated before that the second stage of a probation revocation proceeding, at which the court decides what sanctions to impose for probation violations, is not intended to be a full-blown trial and standard trial rights do not apply. *See United States v. Morin*, 889 F.2d 328, 332 (1st Cir.1989). Consequently, there was no error here.

B. *Police Subterfuge*

■ The final issue requiring discussion is Giannetta's contention that Frost's searches were merely a subterfuge for a criminal investigation being conducted by the police. Specifically, Giannetta argues that Detective Barker was the true initiator of the searches and that police objectives rather than probation objectives were the motivation behind the searches.

Courts have uniformly held that probation and parole officers may not serve as "stalking horses" for the police by initiating searches solely for police purposes in order to help police circumvent the fourth amendment's warrant requirements. *See United States v. Cardona*, 903 F.2d 60, 65–66 (1st Cir.1990); *United States v. Jarrad*, 754 F.2d 1451, 1454 (9th Cir.), *cert. denied*, 474 U.S. 830, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985). The mere presence of police during a probation search, however, does not transform the search into a police search. *See United States v. Jeffers*, 573 F.2d 1074, 1075 (9th Cir.1978) (per curiam). Nor is mutually beneficial cooperation between probation officers and other law enforcement officials precluded. *See United States v. Consuelo–Gonzalez*, 521 F.2d 259, 267 (9th Cir.1975) (en banc).

We find no indication in the record of any improper police involvement sufficient to deem the probation searches at issue here mere subterfuges for a police investigation. All the evidence points to the fact that Frost was energetically pursuing his own investigation of Giannetta and that the searches were performed as part of his investigation rather than at the behest of the police. Although Frost and Detective Barker did cooperate and were investigating, in part, the same suspected offenses, and although Barker was present at the first search of Giannetta's residence and gave advice on where to search, the record reveals that it was Frost's decision to search and that he was in charge of the searches and decided what to seize. We find no sign of any subterfuge.

We have considered appellant's remaining arguments and find them without merit. Accordingly, the order of the district court is

*Affirmed.*