USCA1 Opinion

 

 United States Court of Appeals For the First CircuitNo. 98-1129 UNITED STATES OF AMERICA, Appellee, v. HUSSEIN HAMIE, Defendant, Appellant. APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] Before Selya, Circuit Judge, Coffin and Campbell, Senior Circuit Judges.   Lenore Glaser, by Appointment of the Court, for appellant. John M. Griffin, Assistant United States Attorney, with whomDonald K. Stern, United States Attorney, was on brief for appellee.January 19, 1999   COFFIN, Senior Circuit Judge. While investigating hisroommate for credit card fraud, law enforcement officers seizedevidence implicating appellant Hussein Hamie ("Hamie") in similarcriminal activities. Hamie, filing a motion to suppress, claimedthat the seizure was unconstitutional. The district court deniedthe motion, and the government introduced much of the evidence attrial. Hamie was convicted of eleven counts involving credit cardfraud, deceptive use of social security numbers and moneylaundering. On appeal, he renews his claim that the evidence wasseized unlawfully and also challenges remarks made during theprosecution's closing argument. We conclude that there was noerror either in admitting the evidence seized or in overrulingHamie's objections to the prosecutor's argument, and affirm. I. Background Federal agents were investigating both Hamie and hisroommate, Anthony El Zein ("El Zein"), for purchasing stolencigarettes, and El Zein individually for his participation in acredit card fraud scheme. During the course of that investigation,Hamie spoke to a cooperating witness not only about trafficking instolen property such as cigarettes, but also about "boosting"credit cards by sending the card companies checks from accountsbacked by insufficient funds. The government arrested both Hamieand El Zein on October 25, 1996. Thereafter, federal agentsobtained a search warrant authorizing the search of "the residenceof Anthony El Zein" for evidence of credit card fraud. Upon entering the deserted apartment, one of the agentsbegan to search a bedroom. Although it was not clear whether theroom belonged to Hamie or El Zein, the officer discovered creditcards in each of their names on the nightstand. Also present wereEl Zein's address book and Hamie's student organizer. Underneaththe nightstand, the agent found a briefcase with no identifyingtags or other information. When the briefcase was partiallyopened, he found a silver box inside. The box was inscribed withthe insignia of American Express, one of the credit card companieswith which El Zein had an account.  The silver box, in turn, contained a Massachusetts stateidentification card and two California driver's licenses in thenames of Hussein M. Sleiman and Abbas M. Sleiman, but with Hamie'spicture on them. The agent noticed that Hamie's clothing, hishaircut, and the background were precisely the same in theidentification photos. The officer also found multiple creditcards in those other names, as well as an index card listing thecorresponding social security numbers. The agent then examined therest of the briefcase's contents, which consisted of credit cardapplications, courtesy checks, credit reports, and correspondencerelating to Hussein Sleiman, Abbas Sleiman, and Hamie. At this point, the agent believed the bedroom to beHamie's, but continued to search both because he believed theevidence found in the silver box to be sufficient to constituteprobable cause, and because he thought the room might contain otherevidence relating to El Zein. During the rest of the search of thebedroom, the officer seized a number of other pieces of evidencewith the names Hussein Sleiman, Abbas Sleiman, and Hamie on them,as well as items which turned out to be irrelevant, including,inter alia, a muffin recipe, jeans recently purchased with a creditcard, and personal photographs and negatives. Based on the new evidence, the government filed asuperseding indictment charging Hamie with credit card fraud,deceptive use of social security numbers and money laundering. Prior to trial, Hamie moved to suppress all the evidence seized inthe apartment search, but, after a two-day hearing, the courtdenied the motion. During the trial, Hamie claimed that he lackedthe intent to defraud. In its closing argument, the governmentstated that there was "absolutely no reason to have false licenseslike this, unless you intend to defraud." After defense counselcountered in closing argument that the government had not submittedany evidence that the licenses were actually ever used, thegovernment argued in rebuttal that the licenses provided Hamie withidentification necessary to obtain cash advances. Claiming thatthese comments were impermissible because they related to facts notin evidence, Hamie objected to both, but the court overruled hisobjections. II. AnalysisA. Search and Seizure The Fourth Amendment protects individuals "againstunreasonable searches and seizures," and requires that searchwarrants "particularly describ[e] the place to be searched, and thepersons or things to be seized." U.S. Const. amend. IV. Ingeneral, if the scope of a search exceeds that permitted by theterms of a valid warrant, the subsequent seizure isunconstitutional. See Horton v. California, 496 U.S. 128, 140(1990). In certain limited circumstances, however, the "plainview" doctrine permits law enforcement agents to seize evidence inplain view during a lawful search even though the items seized arenot included within the warrant's scope. See Coolidge v. NewHampshire, 403 U.S. 443, 465 (1971); United States v. Caggiano, 899F.2d 99, 103 (1st Cir. 1990). In order that it remain an exception rather than therule, the Supreme Court has established a two-part test for theplain view doctrine. First, "an essential predicate to [theseizure of evidence not within a warrant's purview is] that theofficer did not violate the Fourth Amendment in arriving at theplace from which the evidence could be plainly viewed." Horton,496 U.S. at 136. Second, the doctrine requires that the evidence'sincriminating character be "immediately apparent" to the officer. Id. The district court's ultimate conclusion that both elementshad been satisfied is reviewed de novo. See United States v.Pervaz, 118 F.3d 1, 2 (1st Cir. 1997). We agree that both requirements are easily met on thefacts of this case. Indeed, there is no dispute concerning thefirst requirement. The government had a valid warrant to searchthe premises. When the agents began searching the bedroom, theywere not sure whom it belonged to; both Hamie's and El Zein'spersonal effects were on the nightstand. The officers wereentitled to open the briefcase under that table to search for ElZein's documents. See United States v. Gianetta, 909 F.2d 571, 577(1st Cir. 1990) ("Courts have regularly held in searches forpapers, the police may look through . . . briefcases . . . andsimilar items and briefly peruse their contents to determinewhether they are among the documentary items to be seized."). Similarly, they were justified in opening the silver box foundinside, especially because it was inscribed with the insignia ofone of the credit card companies with which El Zein had an account. See United States v. Gray, 814 F.2d 49, 51 (1st Cir. 1987) ("[A]nycontainer situated within a residential premises which are thesubject of a validly-issued warrant may be searched if it isreasonable to believe that the container could conceal items of thekind portrayed in the warrant."). Thus, the agents were lawfullypresent and authorized to open the briefcase and box to examinetheir contents. The second element also poses no problem. Theincriminatory nature of the evidence in the silver box wasimmediately apparent to the agent. The term "immediately apparent"has been defined as sufficient to constitute probable cause tobelieve it is evidence of criminal activity. See Gianetta, 909F.2d at 578. This standard requires "[t]here must be enough factsfor a reasonable person to believe that the items in plain view maybe contraband or evidence of a crime. A practical, nontechnicalprobability that incriminating evidence is involved is all that isrequired." Id. at 579 (internal quotations and citations omitted). From the conversation with the cooperating witness, theofficers had information that Hamie was either aware of or involvedin the credit card fraud scheme. When the agent opened the silverbox, he found licenses with Hamie's picture on them, but in twoother names. The fact that the background, Hamie's clothing andhis haircut were the same in both identification photos increasedthe agent's suspicions. In addition, he discovered a number ofcredit cards in those other names and the index card with thecorresponding social security numbers. A reasonable personcertainly would have believed that these items provided Hamie withfalse identities and hence may have been evidence of credit cardfraud. The agent need not be convinced beyond a reasonable doubt,but merely have probable cause to believe that the evidence wasincriminatory. See id. at 578-79. We have no doubt that such astandard has been satisfied here. Once the agent came across the false licenses and creditcards, the incriminatory nature of any other items in those namesbecame immediately apparent to the agent. When the agent found theother courtesy checks, credit card applications, and credit carddocuments, he reasonably and accurately believed that he hadprobable cause to seize them, and his decision to do so fell wellwithin constitutional bounds. See id. at 577 (agent searching forevidence of insurance and credit card fraud was justified in alsolooking for evidence of bank fraud, once he found obvious evidenceof that crime). As the Supreme Court has stated, "[a]n example of theapplicability of the 'plain view' doctrine is the situation inwhich the police have a warrant to search a given area forspecified objects, and in the course of the search come across someother article of incriminating character." Coolidge, 403 U.S. at465-66. That scenario is precisely what occurred here. Thedistrict court properly found that the licenses, credit cards andother credit documents came within the plain view exception. Hamie attempts to overcome this conclusion by claimingthat the officers were engaged in a fishing expedition or "generalsearch," pointing to items seized that clearly had no connectionwith the criminal charges, such as the muffin recipe and familyphotos. He argues that the penalty for such a broad search issuppression of all items seized. Although courts have periodicallyapplied the extraordinary and drastic remedy of suppressing allevidence seized, this has occurred only in extreme situations, suchas when the lawful basis of a warrant was a pretext for theotherwise unlawful aspects of a search or when the officersflagrantly disregarded the terms of the warrant. See United Statesv. Foster, 100 F.3d 846 (10th Cir. 1996); United States v. Young,877 F.2d 1099, 1105 (1st Cir. 1989); United States v. Rettig, 589F.2d 418, 423 (9th Cir. 1978). That was not the case here. To alarge degree, the evidence seized fell within the limits of thewarrant or the plain view exception. While officers did seize someitems clearly unrelated to the subject of the warrant, the searchwas neither a pretext for an attempt to find those items, nor didthe officers flagrantly disregard the terms of the warrant byseizing a few items beyond its scope. The irrelevant evidence wasa very small tail on a very large dog. In general, the improper seizure of "many items outside[a] warrant's scope . . . does not alone render the whole searchinvalid and require suppression and return of all documentsseized." Young, 877 F.2d at 1105. Instead, the normal remedy isto suppress the use of any items improperly taken. See, e.g.,Waller v. Georgia, 467 U.S. 39, 44 n.3 (1984); United States v.Abrams, 615 F.2d 541, 550 (1st Cir. 1980) (Campbell, J.,concurring) ("It is clear that overzealous execution [of a searchwarrant] requires suppression only of any materials seized outsideof the warrant's authority (and the fruits of any such improperlyseized material)."). To the degree that the unauthorized itemswere improperly seized, there was no need to suppress them becausethe government never sought to introduce them at Hamie's trial.B. Closing Arguments Hamie's second challenge to his conviction concerns twostatements made by the prosecutor, one in closing argument and oneduring rebuttal argument. In the first, the prosecutor argued thatthere was no reason for Hamie to have the false licenses unless heintended to defraud someone. After Hamie asserted that there wasno evidence that the licenses were, in fact, used to defraud, theprosecutor argued that Hamie would be required to presentidentification to obtain cash advances, which the evidence shows hedid on a number of occasions. Hamie claims that both commentsrefer to facts not in evidence. It is well settled that in its closing argument theprosecution may not rely on knowledge or evidence unavailable tothe jury. United States v. Smith, 982 F.2d 681, 683 (1st Cir.1993). On the other hand, the prosecutor may attempt to persuadethe jury to draw inferences from the evidence. United States v.Moreno, 947 F.2d 7, 8 (1st Cir. 1988). This is a narrow path totread, with some comments being impermissible because they rely ontoo big an inferential leap, see, e.g., United States v. Artus, 591F.2d 526, 528 (9th Cir. 1979) (prosecution improperly discussed theauthority of Director of Federal Bureau of Prisons in closingargument even though the details of his powers had not been placedin evidence), and others being within permissible limits, see,e.g., Moreno, 947 F.2d at 8 (prosecutors permissibly asked jury toassess the reasonableness of the defendant's contention that shewas unaware of boyfriend's drug distribution activities). Whileprosecutors should be wary of crossing that boundary, we have notrouble identifying the challenged statements as reasonableinferences in this particular case. We have said in a variety of different ways that theprosecution may "call[] on the jury to employ its 'collectivecommon sense' in evaluating the evidence and to draw reasonableinferences therefrom." United States v. Abreu, 952 F.2d 1458, 1471(1st Cir. 1992) (internal quotation omitted). "[I]n . . . choosingfrom among competing inferences, jurors are entitled to take fulladvantage of their collective experience and common sense." UnitedStates v. O'Brien, 14 F.3d 703, 708 (1st Cir. 1994). See alsoUnited States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) (Whenthey become members of a jury, individuals should neither "divorcethemselves from their common sense nor [] abandon the dictates ofmature experience."). There is no doubt that the prosecutor's first commentmerely asked the individuals to draw an inference from their lifeexperiences. The prosecutor argued that the false licenses wereevidence of fraud because there was no other reason for Hamie topossess them. If the jury's common sense and experience led it toconclude that Hamie had other grounds for possessing the falselicenses, the jury could have rejected the prosecution's argumentand could have drawn a reasonable inference in Hamie's favor. Moreover, in his closing argument defense counsel could havesuggested alternative legal reasons for possessing false licenses. The fact that the jury drew an inference unfavorable to Hamie doesnot make the prosecutor's comment impermissible. The reference to Hamie's need for identification gives usslightly more pause, but we are firmly convinced that the argumentwas permissible. The government claimed that the false licenseswere evidence of the credit card fraud scheme because Hamie wouldneed to present such identification to get a cash advance, which hedid several times. The prosecution's comment hearkened back toevidence that Hamie offered to teach the cooperating witness how toobtain cash advances from banks based on the fraudulent creditcards. In making this argument, the prosecution again asked thejury to draw on their collective life wisdom and practice. It iscommonplace for a bank employee to request identification prior toexecuting a financial transaction, a policy with which jurors wouldhave extensive experience. Indeed, we would be surprised if a bankwere to provide a customer with sums of cash based merely on thepresentation of a credit card and no identification linking thatparticular individual to the card. While the jury had no actualevidence that Hamie would be asked for identification before a bankcould process a cash advance, the prosecution's comment was anallowable inference relying on the jury's experience. See Ortiz,966 F.2d at 712. Although it might have been preferable for theprosecution to have introduced evidence to that effect, theargument was permissible. Neither ground for appeal is meritorious, and theconviction is therefore affirmed. Affirmed.